**MONARCH INDUSTRIAL CORPORA-TION, Plaintiff,**

v.

**AMERICAN MOTORISTS INSURANCE COMPANY, A/S J. Ludwig Mo-winckels Rederi, Defendants.**

**AMERICAN MOTORISTS INSURANCE COMPANY, Third-Party Plaintiff,**

v.

**A/S J. LUDWIG MOWINCKELS RED-ERI, Third-Party Defendant.**

**No. 61 Civ. 4038.**

United States District Court
S. D. New York.

Oct. 16, 1967.

Bennett Silverman, James Lawrence Garrity, Katz, Wittenberg & Katz, New York City, for plaintiff.

Philip V. Moyles, William G. Mead, Haight, Gardner, Poor & Havens, New York City, for defendant Carrier.

Donald F. Connors, Bigham, Englar, Jones & Houston, New York City, for defendant American and third-party plaintiff.

## OPINION

MOTLEY, District Judge.

This is an action for damages incurred when a cargo of about 210 tons of steel shipped from Buenos Aires, Argentina, to New York, New York, arrived in a seriously damaged condition in late December 1959.

Plaintiff, Monarch Industrial Corporation (hereinafter Monarch) was the pur-

chaser of the cargo. A New York business corporation, Monarch was engaged in exporting and importing steel and steel products in 1959–60.

Defendant, American Motorists Insurance Company (hereinafter American) is an insurance company organized under the laws of the State of Illinois, is licensed to and is doing business in the State of New York. As a part of its business, American writes ocean marine cargo insurance. American insured the cargo purchased by Monarch against all risks of damage to the steel resulting from any external cause during the voyage.

Monarch commenced this action on October 24, 1961, in the Supreme Court, State of New York, County of New York. The only defendant named in the action was American. Monarch sought to recover under the insurance policy the difference between the value of the steel in its damaged condition on arrival in New York, $16,133.50, and the insured value, $54,600.00, the difference being $38,466.50. The steel had been delivered to Monarch in the damaged condition on January 4, 1960.

On November 14, 1961, American removed the action to this court on the ground of diversity of citizenship and requisite jurisdictional amount. Two days after removal, American served a third-party complaint on the ocean carrier, A/S J. Ludwig Mowinckels Rederi (hereinafter Mowinckels). This complaint alleged that if Monarch recovers against American, Mowinckels would be liable over for said damage to American "who will have been subrogated" to Monarchs rights against Mowinckels.

Mowinckles is a Norwegian corporation, a common carrier by water, owning and operating the S. S. Salta, doing business in the State of New York and having agents, Cosmopolitan Shipping Co., Inc., in the City of New York.

On December 15, 1961, Mowinckles appeared in this action. On June 14, 1962, Monarch was permitted by order of this court to file and serve an amended complaint setting forth its claim under the policy against American and a separate claim against Mowinckles. This claim against Mowinckles alleged that it received on board the S. S. Salta the steel for which it issued a clean "on board" bill of lading dated November 27, 1959. The amended complaint further alleged that the bill of lading was to have effect in accordance with the provisions of the Carriage of Goods by Sea Act of the United States (hereinafter COGSA). 46 U.S.C. §§ 1300–1315. Paragraph 18 of the bill of lading incorporated therein the one year statute of limitations on bringing suit against the carrier which is provided for by the COGSA. 46 U.S.C. § 1303(6).

The order of this court allowing the amended complaint expressly reversed decision on its legal sufficiency and timeliness.[1]

In its answer to the third-party complaint and the amended complaint, Mowinckles asserts as a defense the statute of limitations contained in the COGSA.

Mowinckles also challenges the jurisdiction of this court over Monarch's direct claim against it in admiralty since this is a removed case and state courts do not have admiralty or maritime jurisdiction.

Mowinckles opposes a second pending motion to amend the complaint made by Monarch just prior to trial. Monarch asks leave to amend the complaint by a statement identifying its claim as an admiralty claim within the admiralty jurisdiction of this court as provided by Rule 9(h), Fed.R.Civ.P. Such an amendment, Monarch claims, would enable it to take advantage of admiralty third-party practice. Rule 14(c), Fed.R.Civ.P. Monarch further claims that such an

---

1. The order provided:
   In the exercise of the court's discretion plaintiff's motion under Rule 15 is granted. This does not constitute a finding that plaintiff's claim against A/S J. Ludwig Mowinckles Rederi is legally sufficient or is not time-barred. A/S J. Ludwig Mowinckles Rederi may still raise this question by appropriate motion.

amendment would relate back to the time of the commencement of action against American.

Both American and Mowinckles denied liability for damage to the steel. The case went to trial without a jury on December 12, 1966. At the commencement of the trial, upon agreement of the parties and consent of the court, the trial was bifurcated, the question of liability being tried first. Rule 42(b), Fed.R.Civ. P. The court also reserved ruling on the defense of the statute of limitations and amendments to the complaint until after the trial on the issue of liability.

This court now holds:

1. This court has jurisdiction of this removed action brought by Monarch against American and the third-party action commenced in this court by American against Mowinckles.

2. Time for American to bring suit against Mowinckles was extended by Mowinckles and suit was timely filed by American against Mowinckles within the extension period.

3. The extension of time granted American by Mowinckles for bringing suit did not inure to the benefit of Monarch. Consequently, Monarch's direct claim against Mowinckles is barred by the applicable statute of limitations. The amended complaint must be dismissed for failure to state a claim upon which relief may be granted.

4. Even if Monarch could have taken advantage of the extension of time, the statute of limitations bars the relating back of the amendment to the time of filing suit since the amendment seeks to change the party against whom the claim, arising out of the same transaction, is pressed. Rule 15(c), Fed.R.Civ.P.

5. An amendment to identify a claim in admiralty, Rule 9(h), Fed.R.Civ.P., is governed by the principles applicable to amendments under Rule 15. Consequently, Monarch's pending motion to amend fails to hurdle the statute of limitations bar. Granting the amendment would also be futile for the reason that American in its third-party complaint has not demanded judgment against Mowinckles in favor of Monarch as American was permitted to do by the provisions of Rule 14(c). The motion for leave to amend the complaint to identify a claim in admiralty must be denied.

6. Monarch failed to prove by a preponderance of the credible evidence: 1) pre-existing good condition of the steel; 2) that any demonstrable damage to the steel resulted from external causes during the ocean voyage; 3) that any damage to the steel upon discharge from the vessel in New York was more than superficial and could be segregated from the pre-existing damage. Therefore, American is not liable under the policy of insurance to pay the loss sustained by Monarch. Monarch's action against American must be dismissed.

7. Alternatively, the court holds that if the complaint could have been amended, Monarch could not prevail on the merits. The same proof was offered for both claims.

8. Since American has sustained no loss for which it is entitled to indemnification over against Mowinckles, the third-party action by American against Mowinckles must also be dismissed.

The following constitutes the court's findings of fact and conclusions of law in support of the foregoing holdings.

### Jurisdiction on Removal

Jurisdiction of this court on removal of Monarch's claim against American from the state court is civil. See Wilburn Boat Co. v. Fireman's Insurance Co., 348 U.S. 310, 311, 313, 75 S.Ct. 368, 99 L.Ed. 337 (1955). A mandatory prerequisite to the right of removal is that the state court have jurisdiction of a pending civil action of which this court has concurrent original jurisdiction. 28 U.S.C. § 1441; A. J. Curtis & Co. v. D. W. Falls, Inc., 305 F.2d 811, 814 (3rd Cir. 1962). The rule is well settled: "The jurisdiction of the federal court on removal is, in a limited sense, a derivative jurisdiction. If the state court lacks jurisdiction of the subject-matter or of the parties, the federal court acquires

none, although it might in a like suit originally brought there have had jurisdiction." Freeman v. Bee Machine Co., 319 U.S. 448, 449, 63 S.Ct. 1146, 87 L.Ed. 1509 (1943); State of Minnesota v. United States, 305 U.S. 382, 389, 59 S. Ct. 292, 83 L.Ed. 235 (1939); Lambert Run Coal Co. v. Baltimore & Ohio R. R. Co., 258 U.S. 377, 382, 42 S.Ct. 349, 66 L. Ed. 671 (1922); Devlin v. Flying Tiger Lines, Inc., 220 F.Supp. 924, 928 (S.D. N.Y.1963); Electronic Race Patrol, Inc. v. Nat'l Trailer Convoy, Inc., 191 F.Supp. 364 (S.D.N.Y.1961).

■ Defects in the jurisdiction of the state court as respects subject matter or parties is "not cured by removal but could thereafter be challenged in the federal court." Freeman v. Bee Machine Co., supra, at 451, 63 S.Ct. at 1148; General Investment Co. v. Lake Shore & Michigan Southern Ry. Co., 260 U.S. 261, 288, 43 S.Ct. 106, 67 L.Ed. 244 (1922).

■ The maritime and admiralty jurisdiction conferred by the Constitution and laws of the United States upon the District Courts of the United States is exclusive, The Glide, 167 U.S. 606, 623, 17 S.Ct. 930, 42 L.Ed. 296 (1897), except where the common law gives a concurrent remedy in the state courts in civil actions. 28 U.S.C. § 1333; Sound Marine & Machine Corp. v. Westchester County, 100 F.2d 360 (2d Cir. 1938), cert. denied, 306 U.S. 642, 59 S.Ct. 582, 83 L. Ed. 1042 (1939). Monarch could not have commenced an admiralty action against American in the state court because that court lacked admiralty and maritime jurisdiction. Monarch's action when commenced in the state court could only have been a civil action for damages for breach of contract. In other words, the state court action was based upon a common law concurrent remedy under the contract of marine insurance.

■ In order for a case to be removed to this court from a state court having jurisdiction, this court must also have concurrent original jurisdiction. 28 U. S.C. § 1441. This court has original jurisdiction of all civil actions involving, as to the matter in controversy, the sum or value of $10,000, exclusive of interests and costs, and which is between citizens of different states, 28 U.S.C. § 1332(a). For the purposes of removal of a case on the grounds of diversity of citizenship, a corporation is deemed to be a citizen of any state by which it has been incorporated and of the state where it has its principal place of business. 28 U.S.C. § 1332(c). American was incorporated in the State of Illinois and has its principal place of business there. Monarch was incorporated in the State of New York and has its principal place of business in that state. The amount which Monarch seeks to recover exceeds, exclusive of interests and costs, the sum of $10,000. Consequently, American properly removed the state court action to this court.

■■ Additionally Monarch's action is based upon a policy of marine insurance which has been held to be a maritime contract. Insurance Co. v. Dunham, 11 Wall. 1, 78 U.S. 1, 20 L.Ed. 90 (1871). Although rights and liabilities under such policies are to be determined by reference to applicable state law in the absence of federal statutory law or a judicially established federal admiralty rule, Wilburn Boat Co. v. Fireman's Insurance Co., supra, nevertheless, such an action is one arising under the Constitution of the United States. Article III, Section 2. Wilburn Boat Co. v. Fireman's Insurance Co., supra. This court has original jurisdiction of all civil actions arising under the Constitution and laws of the United States in which the matter in controversy exceeds the sum or value of $10,000, exclusive of interests and costs. 28 U.S.C. § 1331(a). Such a case is removable to this court without regard to the citizenship of the parties. 28 U.S.C. § 1441(b). Consequently, this court holds that Monarch's action against American based upon a marine insurance policy was properly removed to the "law side" of this court in 1961.

*Applicable Rules of Procedure on Removal*

■ Following removal, the Federal Rules of Civil Procedure became applica-

ble to and governed the prosecution of this action. Rule 81(c), Fed.R.Civ.P. While jurisdictional defects are not cured, this court could employ its "full arsenal of authority", including "the power to permit a recasting of pleadings or amendments to complaints in accordance with the federal rules." Freeman v. Bee Machine Co., supra, 319 U.S. 448, 452, 63 S.Ct. 1148 (1943). Accordingly, after removal, American sought and obtained an order of this court permitting it to serve a third party complaint on Mowinckles. Rule 14(a) (c), Fed.R.Civ.P.

### The Statute of Limitations

Mowinckles filed an appearance in the action on December 15, 1961, but did not file any answer to the third party complaint until this court's order of June 14, 1962 allowing Monarch to file an amended complaint making Mowinckles a primary defendant.

On July 2, 1962, Mowinckles filed its answer to the third-party complaint and the amended complaint in which it raised as a separate defense the applicable statute of limitations. 46 U.S.C. § 1303(6). The statute provides that suits against the carrier for loss or damage to goods must be brought within one year after delivery of the goods. This provision was embodied in the bill of lading (Paragraph 18).

Under the Federal Rules of Civil Procedure, the defense of the statute of limitation could be raised by Mowinckles against Monarch in Mowinckles' answer to the third-party complaint, Rule 14(a) (c), as well as in the Mowinckles' answer to the amended complaint, Rule 15(c).

Delivery of the steel took place on January 4, 1960. The time for commencing suit against Mowinckles by both Monarch and American expired on January 4, 1961. United States v. The South Star, 210 F.2d 44 (2d Cir. 1954). Accord, States Steamship Co. v. American Smelting & Refining Co., 339 F.2d 66 (9th Cir. 1964), cert. denied, 380 U.S. 964, 85 S.Ct. 1109, 14 L.Ed.2d 155 (1965). American Oil Company v. The Steamship Ionian Challenger, 257 F.Supp. 540 (S.D.

N.Y.1965). However, the one year limitation could be waived or tolled by an extension of time to sue granted by the carrier or the ship. United Fruit Co. v. J. A. Folger & Co., 270 F.2d 666 (5th Cir. 1959), cert. denied, 362 U.S. 911, 80 S. Ct. 682, 4 L.Ed.2d 619 (1960); International Harvester Export Co. v. Skibsaktieselskab, Hilda Knudsen, 106 F.Supp. 880 (S.D.N.Y.1952).

By letters dated November 30, 1960; February 24, 1961; April 10, 1961; September 13, 1961 and September 27, 1961, between Bigham, Englar, Jones & Houston, attorneys for American, and Cosmopolitan Shipping Co., Inc., agents for Mowinckles, there were various extensions of time to institute suit. The last letter extended the time until November 27, 1961.

When by an exchange of letters, before the running of the statute of limitations, it is agreed to extend the time for a fixed and reasonable period, the carrier's waiver of the statute is for that period only. There is no waiver of the statute as to suits filed after the extension period. United Fruit Co. v. J. A. Folger & Co., supra. In some circumstances a party, by his representations, promises, or conduct, may also be estopped to assert the statute. Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959).

Here, the court finds no estoppel. The court finds that the extensions of time given by Mowinckles to the attorneys for American had tolled the running of the statute for a definite, reasonable period of time on each occasion. The court further finds that this extension was given to American alone. "It is in the interest of all shippers and all carriers that when a steamship company grants an extension of the time for suit, in writing, before the running of the statute, specifically limited to a fixed and reasonable time, that the parties be able to rely on the terms of their agreement." United Fruit Co. v. J. A. Folger & Co., supra, 270 F.2d at 670.

American served its third-party complaint on November 16, 1961, before the expiration of the stipulated time to institute suit, i. e., November 27, 1961. Mowinckles asserts, however, that American is estopped by the law of subrogation from taking advantage of the extension of time that it obtained. At the time American served its third-party complaint, it had not paid any money to Monarch and was denying its liability, but it was being sued by Monarch.

■■■ The law in this Circuit is that an insurance company can bring a third-party action pursuant to Rule 14 (a), Fed.R.Civ.P., against a person not a party to the action "who is or may be liable" to it for all or part of the plaintiff's claim, despite the fact that the insurer had not yet been subrogated to the original plaintiff's rights against the third-party defendant and a direct action by the original plaintiff against the third-party defendant would be time-barred. St. Paul Fire Marine Insur. Co. v. United States Lines Co., 258 F.2d 374 (2d Cir. 1958), cert. denied, 359 U.S. 910, 79 S.Ct. 587, 3 L.Ed.2d 574 (1959). Accord, Glens Falls Indemnity Co. v. Atlantic Building Corp., 199 F.2d 60 (4th Cir. 1952), Concordia College Corp. v. Great Am. Ins. Co., 14 F.R.D. 403 (D. Minn.1953). It must be noted, however, that though the third-party plaintiff may commence its action before it has been subrogated, it cannot bring a separate suit on its own behalf as subrogee prior to the moment of payment or until it becomes legally bound to make payment. Meredith v. The Ionian Trader, 279 F.2d 471 (2d Cir. 1960). This court holds that it properly has jurisdiction of American's third-party claim against Mowinckles and that the claim was timely brought within the stipulated extension of time for suit.

Monarch claims that the extension of time was secured for its benefit since the interests of a subrogor and subrogee are identical, citing Meredith v. The Ionian Trader, supra. Moreover, says Monarch, the extension of time could only have been secured for it because at the time of the extension the insurer had no claim since it had not been subrogated to Monarch's rights against Mowinckles. Meredith v. The Ionian Trader, supra.

■■■ Though it is true, as stated above, that an insurer acquires no interest in a claim of the insured against a third-party until it is subrogated to the rights of the insured, this merely limits the ability of the insurer to bring suit on its own behalf prior to subrogation. The doctrine of subrogation does not prevent the insurer from taking whatever steps it believes necessary, such as impleading a third party, if it is sued on the insured's claim. St. Paul Fire & Marine Insurance Co. v. United States, supra.

■■■ In fairness to Mowinckles, Monarch should not be allowed to claim the benefit of the extension which it neither sought nor received from Mowinckles. Since Mowinckles gave its extension only to American for a definite, reasonable period of time, it should be able to rely on the terms of the agreement and not be estopped to assert the statute against someone else suing at a later time.

### Effect of Amendments

American commenced its third-party suit against Mowinckles on November 16, 1961. Monarch did not receive leave to file its amended complaint against Mowinckles until June 14, 1962. Even if Monarch could have taken advantage of the extension of time, its claim against Mowinckles asserted in an amended complaint seven months later would, nevertheless, be time-barred by the provisions of Rule 15(c), Fed.R.Civ.P.[2]

2. The Rule provides:
Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment *changing the party* against whom a claim is asserted relates back if the foregoing provision is satisfied and, *within the period provided by law for commencing the action against him*, the party to be brought in by amendment (1) has re-

The claim asserted against Mowinckles arises out of the same transaction set forth in the original complaint, but the amendment changes the party against whom Monarch's claim is asserted. Since there is a change of party, relation back to the time of filing the original complaint is precluded, unless the amendment is filed within the period provided by law for commencing the action against the new party. See Hammond-Knowlton v. United States, 121 F. 2d 192, 193 (2d Cir. 1941), cert. denied, 314 U.S. 694, 62 S.Ct. 410, 86 L.Ed. 555 (1941). Rule 15(c) was amended in 1966 to make this clear. 3 Moore's Federal Practice 1044–1045, ¶ 15.15 [4–2] (2nd ed. 1967). Here, there was an extension of time for a definite period. The amendment was not filed within the extension period. The same principle must apply to a definite extension of time as is invoked with respect to the applicability of the statute of limitations.

Rule 14(a), Fed.R.Civ.P., was amended in 1946 to make impossible the tender of additional defendants to plaintiff by a defendant. Following the amendment, the only basis for including a third-party defendant in a civil action is liability over to the defendant. Plaintiff, after the amendment, could bring a direct action against a third-party defendant only by an amendment to his complaint. Such an amendment is treated as an original complaint commenced by plaintiff against the third-party defendant. The amended pleading is subject to the applicable statute of limitations. Carlisle v. Monongahela Ry. Co., 16 F.R.D. 426 (W.D.Pa.1954); Horan v. Pope & Talbot, Inc., 119 F.Supp. 711 (E.D.Pa.1953).

Just before the trial, Monarch asked leave to amend its complaint to identify a claim in admiralty as provided by Rule 9(h), Fed.R.Civ.P., so that it might take advantage of admiralty third-party practice defined in Rule 14(c), Fed.R.Civ.P. This motion was conditioned upon the court finding that Monarch's direct claim against Mowinckles is time-barred.[3]

As held above, Monarch's action in the state court was properly removed to the civil jurisdiction of this court. The first question which Monarch's pending motion presents is whether this civil jurisdiction, which is derivative in the sense that this court acquired only the jurisdiction which the state court had, can be amended to state a claim cognizable only within the jurisdiction of this court. The answer to the question is in the affirmative. Freeman v. Bee Machine Co., supra, 319 U.S. 448, 63 S.Ct. 1146, 87 L.Ed. 1509 (1943). However, Rule 9(h), Fed.R.Civ.P., provides, in part, that, "The amendment of a pleading to add or withdraw an identifying statement is governed by the principles of Rule 15."

The basic principle of Rule 15(a), Fed.R.Civ.P., is that leave to amend a pleading "shall be freely given when justice so requires". The mandate of the rule must be heeded. Furthermore, leave to amend may not be denied without stating a reason for such denial, even though granting leave is within the discretion of the trial court. Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed. 2d 222 (1962).

Monarch's second motion to amend is conditioned on the court's finding that Monarch's direct action against

---

ceived such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him. (Emphasis Added).

3. Rule 9(h) provides:
A pleading or count setting forth a claim for relief within the admiralty and

maritime jurisdiction that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of Rule 14(c) * * * If the claim is cognizable only in admiralty it is an admiralty or maritime claim for those purposes whether so identified or not. The amendment of a pleading to add or withdraw an identifying statement is governed by the principles of Rule 15.

Mowinckles is time-barred. This court has now so found. Monarch's motive, therefore, is to circumvent the statute of limitations. If the first attempt by Monarch to press its claim against Mowinckles by amendment is time-barred because Rule 15(c) would preclude relation back of the amendment to the time of filing suit, then applying the principles of Rule 15(c) to a motion under Rule 9(h), this second attempt to amend the complaint may not be allowed.

Another reason for denying the motion for leave to amend the complaint under Rule 9(h), so that Monarch may take advantage of the admiralty third-party practice provided for by Rule 14(c), is the futility of the proposed amendment. Rule 14(c), substantially the same as former Admiralty Rule 56, allows a defendant as a third-party plaintiff to bring in a third-party defendant who may be wholly or partly liable to plaintiff. The third-party plaintiff "may" demand that judgment be entered against the third-party defendant in favor of the plaintiff.[4] "In other, simpler words, a defending party may set up a target defendant that the original plaintiff must pursue, if the original plaintiff has asserted an admiralty and maritime claim under Rule 9(h)." BRADLEY, ADMIRALTY ASPECTS OF THE CIVIL RULES, 41 F.R.D. 257, 262 (1966).

██ Here, the third-party complaint did not demand judgment on behalf of Monarch against Mowinckles. The third-party complaint by American merely demands judgment against Mowinckles for any amount that American might be held liable for to Monarch. American's pleading is one seeking only indemnification.

Since American's third-party complaint does not meet the requirements of Rule 14(c), Fed.R.Civ.P., this court cannot conclude that American has tendered Mowinckles to Monarch as Monarch claims. An amendment under Rule 9(h) would be futile.

### Failure of Proof

Some time in late October of 1959, Monarch, from New York, informed Hideco S.R.L., an Argentina firm at Buenos Aires, that it was interested in the purchase of cold rolled steel sheets. On or about November 12, 1959, Hideco cabled Monarch advising that there was available 210 tons of such steel of Belgian manufacture, owned by Szusterman Hnos. S.R.L., at a total price of $44,612.-89. At this time, there was a nationwide steel shortage in the United States due to a steel strike.

On November 13, 1959, Monarch cabled Hideco to proceed with the purchase of this steel, C & F New York. Payment was to be made in part by a letter of credit in favor of Szusterman at Buenos Aires, in part by check to Hideco in New York, and part in payment to the ship for freight at New York.

The steel involved had been manufactured in Belgium. It was purchased by Szusterman through Ubbelohode Trading Co., S.P.A., of Belgium in June, 1959. The steel was shipped from Antwerp to Buenos Aires aboard the S.S. Tewkesbury which arrived at Buenos Aires on July 27, 1959.

The sale from Szusterman to Monarch was brought about by Hideco on terms requiring an irrevocable letter of credit not exceeding $33,000 in favor of Szusterman and the balance by check to Hide-

---

4. Rule 14(c), Fed.R.Civ.P. provides:
   When a plaintiff asserts an admiralty claim within the meaning of Rule 9(h), the defendant or claimant, as a third-party plaintiff, may bring in a third-party defendant who may be wholly or partly liable, either to the plaintiff or to the third-party plaintiff, by way of remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences. *In such a case the third-party plaintiff may also demand judgment against the third-party defendant in favor of the plaintiff, in which event the third-party defendant shall make his defenses to the claim of the plaintiff as well as to that of the third-party plaintiff in the manner provided in Rule 12 and the action shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff.* (Emphasis Added).

co. Pursuant to the agreement, on November 23, 1959, Monarch caused Manufacturer's Trust Company of New York to open its irrevocable letter of credit through Banco Shaw S.A., Buenos Aires in favor of Szusterman Hnos. The documents to be presented were: (a) a full set of clean "on board" bills of lading to the order of Manufacturer's Trust Company of New York, evidencing shipment prior to December 10, 1959, of about 210 metric tons of cold rolled steel sheets, (b) commercial invoices, (c) U. S. Consular Invoice and (d) Superintendence Company Report, in duplicate, marked freight prepaid. The requirement of the Superintendence Company Report was later deleted from the letter of credit by Monarch to avoid delay in shipping the steel. Monarch desired to take advantage of the increase in steel prices due to the strike.

Monarch's purchase of the steel sheets was conditioned upon the delivery of the shipment to a specified vessel leaving Buenos Aires on or about November 22, 1959 and a clean "on board" bill of lading as required by the letter of credit.

From July 27, 1959, when it was unloaded from the S. S. Tewkesbury, until November 26, 1959, when transported for loading on the specified ship, the S. S. Salta, the steel had been placed in storage in Customs' custody in the Port of Buenos Aires. The place of storage was an open area. The steel had been placed on a concrete floor and was at no time covered or protected from the elements. During the four month open storage period, approximately 23.8 inches of rain fell during some part of at least 46 days. The weather was warm.

The steel sheets of varying sizes and gauges were packed in 101 bundles, each containing from 50 to 100 sheets with edges meeting. The steel sheets had been oiled on both sides and each bundle was wrapped in a water resistant paper. Steel wrapping sheets were bent in the shape of a "U" and placed around the edges of each bundle. Thereafter, steel covering sheets had been placed on the top and bottom of the bundle and bound to the edging sheets by steel straps running both lengthwise and around the girth of the bundles.

On or about November 20, 1959, the steel was given a cursory, external inspection by Jose Lescouitch, sales manager of Hideco, in their place of open storage. Mr. Lescouitch's testimony was that he saw the bundles to be intact, having no sheets exposed, in stacks in a black area on a concrete floor, fenced by wire netting. According to Lescouitch, three or four bundles were slightly opened, and no rust being noted on the sheets, they were again wrapped as before. On the outside of the bundles, a moderate amount of oxidation (rust) was noted.

On November 26, and 27, 1959, the steel was delivered to the S. S. Salta for shipment to New York. The stevedoring tally sheets showed no apparent damage to the goods. After the bundles were loaded, the ship's first mate, executed and delivered to the shipper his mate's receipt for the bundles acknowledging them to be in "apparent good order and condition". Upon the basis of the mate's receipt, on November 27, 1959, Agencia Maritima Dodera S. A., acting for Mowinckles, issued and delivered to Szusterman a bill of lading acknowledging receipt of the steel "on board in apparent good order and condition."

The chief officer's testimony was that the steel was received rusted and bent. This testimony was corroborated by entries made in the ship's log under oath.

On or about December 1, 1959, approximately five days after the vessel Salta had sailed from Buenos Aires, Monarch, through its insurance broker, applied to American for, and received, an all risk insurance certificate on the shipment. On December 2, 1959, American's certificate of insurance was issued covering the shipment in the amount of $50,-120, plus duty value of $4,480, warehouse to warehouse. The principal insuring clause reads as follows: "Against all risks of physical loss or damage to the property insured from any external causes * * *"

At the time of the application for, and issuance of the certificate of insurance, Monarch knew that the steel had been manufactured in Belgium but had no direct knowledge as to the dates when the sheets had been shipped to or arrived at Argentina. Monarch had no knowledge as to how long the sheets had been in Argentina or how they had been stored in the customs area of Argentina. Monarch's broker did not inform American's underwriter that the steel was of Belgian manufacture.

The underwriter, although he assumed that the goods were not of Argentina manufacture, would not have agreed to insure the steel had he been informed that the steel had lain in open storage at the Port of Buenos Aires for four months.

On December 1, 1959, Szusterman presented to Banco Shaw, S.A., in Argentina, the bill of lading, commercial and consular invoices for the steel. The consular invoice was not marked freight prepaid but marked freight payable at destination. On December 2, 1959, Manufacturer's Trust Company, in accordance with its letter of credit, made payment through Banco Shaw, S.A., in exchange for the shipping document and charged Monarch. On December 16, 1959, the bills of lading were endorsed and delivered by Manufacturer's Trust Company to Monarch, together with the other shipping documents. Monarch's forwarder paid $3,436.22 for freight and Argentina taxes. Monarch also paid for the insurance.

During the trip, the vessel made several stops. At Cabedelp, additional cargo was loaded into hold No. 1 containing the bundles of steel. No rain fell during that period and the hatch was then closed for the remainder of the trip. During the voyage, the vessel encountered some heavy pitching, temperature variations, and spray over the deck, but there was no evidence of any major accidental or unusual occurrences. There were some repairs to hatches. The vents taking air to the holds were shut for a time because of rain. However, there was no substantial proof that this rain reached the steel and caused damage or that the shutting of the vents was responsible.

On or about December 21, 1959, the steel was unloaded on to the street in front of Pier 56, partially under the West Side Highway. The ship's chief officer testified that the shipment was discharged from the vessel in the same order and condition as when received. Monarch's president tried in vain to get the steel moved immediately to a warehouse but could not because of the backlog caused by a dock strike.

During the last week in December, 1959, Monarch notified American and Mowinckles that the steel had arrived in a damaged condition. On December 30, 1959, an experienced marine surveyor appointed by American inspected the shipment. In his inspection of the bundles and exposed sheets, the surveyor found: 1) the metal wrappers on the bundles in most instances were heavily rusted; 2) the packaging was of poor design and did not adequately protect the steel sheets; 3) there were pools of water on the bundles evidencing recent contact with rain or fresh water; 4) the steel had been wet and rusted quite some time before arrival in New York, and 5) the exposed steel sheets were bent, dented, wet and rusted.

From December 21, 1959 to January 4, 1960 (the latter date being the date on which the sheets were released to Monarch and removed to a warehouse in Queens County) there was some snow and rain in New York and the temperature hovered around the freezing point. During this period, the bundles and sheets were in the custody and control of Mowinckles and the insurance policy was in full force and effect.

On January 11, 1960, representative samples of the bundles were opened in the warehouse and their contents examined by Monarch's president and the marine surveyor. All of the steel had heavy rust at the edges. The surfaces of the sheets were, in various areas, dark brown or blackish in color. Many sheets

were deeply pitted. Many of the bundles examined were not wet, yet they, too, revealed the same quality and quantity of heavy rust, discoloration and pitting. The waterproof paper on many of the bundles (both dry and wet) was stuck to the sheets. This paper was in such a state of deterioration that the condition could only be attributed to the fact that the paper had been wet quite some time prior to January 11. A saline test performed by the surveyor showed no evidence of contact of the steel bundles with sea water.

An expert metallurgist called as a witness by American was of the opinion that the damage to the steel, because of its nature and severity, was not due to any cause which occurred during the period commencing with the loading of the steel on the vessel Salta and ending with delivery to the Queens warehouse. He testified that water on steel sheets would act slowly and could cause the damage actually found under the circumstances described on the entire voyage from Belgium to New York over a long period of time. He further testified that exposure of the bundles to wetting while stored under the West Side Highway from December 21, 1959 to January 4, 1960 could not have caused the damage noted, especially in view of the prevailing freezing temperatures which prevent or inhibit the formation of rust.

The court finds that a preponderance of the evidence established that the serious damage to the steel preceded its loading on the Salta and was caused by exposure to the elements, especially rain, during a period of at least four months in warm weather prior to the effective date of the insurance.

The court also finds that Monarch failed to prove by a preponderance of the evidence that there was additional damage to the steel during the voyage from warehouse to warehouse resulting from external causes and that this additional damage, if any, could be segregated from the pre-existing damage.

In order to recover against American, Monarch had the burden of proving by a preponderance of the evidence that the alleged loss comes within the terms and conditions of the policy. Hillcrea Export & Import Co. v. Universal Insurance Co., 110 F.Supp. 204 (S.D.N.Y.1953), aff'd, 212 F.2d 206 (2d Cir. 1954), cert. denied, 348 U.S. 834, 75 S.Ct. 57, 99 L.Ed. 657 (1954). Swan v. Union Insurance Co. of Maryland, 3 Wheat. 168, 4 L.Ed. 361 (1818). An element of this proof is pre-existing good condition of the steel. Elia Salzman Tobacco Co. v. S. S. Mormacwind, 371 F.2d 537 (2d Cir. 1967); Commodity Service Corporation v. Hamburg-American Line, 354 F.2d 234 (2d Cir. 1965); The Niel Maersk, 91 F.2d 932 (2d Cir. 1937), cert. denied, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582; M. W. Zack Metal Co. v. Federal Insurance Co., 17 A.D.2d 141, 232 N.Y.S.2d 940 (1st Dept. 1962), aff'd 13 N.Y.2d 952, 244 N.Y.S.2d 319, 194 N.E.2d 134 (1963).

The policy of insurance provided that the insurance coverage attached from the time the goods left the warehouse in Buenos Aires until they arrived in the warehouse in Queens County, New York.

The policy further provided that risks covered were:

" * * * all risks of physical loss of or damage to the property from any external cause, irrespective of percentage * * * "

Monarch, therefore, had to prove that the damage to the steel was caused by some external factor during the voyage from warehouse to warehouse. This Monarch failed to do.

As the court said in Greene v. Cheetham, 293 F.2d 933 (2d Cir. 1961) at pp. 936–937:

" * * * the 'all risk' event so covered would not include an undisclosed event that existed prior to coverage, * * * "

In attempting to meet its burden of proving pre-existing good condition, Monarch relied heavily upon the clean "on board" bill of lading and the mate's receipt. These documents were only prima facie proof of the "apparent good order and condition" of the exterior and said

nothing of the inside since these were packaged goods. Commodities Service Corp. v. Hamburg-American Line, supra; The Niel Maersk, supra. The evidence showed, conclusively, that water had gotten inside the steel bundles, had dried, and had damaged the surfaces of the steel sheets and that this damage was not visible from an examination of the exterior.

Monarch not only failed to prove pre-existing good condition and external cause during the voyage but failed to sustain its burden of segregating damage, if any, covered by the insurance which occurred while the steel was on the Salta or partially under the West Side Highway and failed to prove that such segregation is possible. Hallas v. North River Ins. Co. of New York, 279 App.Div. 15, 107 N.Y.S.2d 359 (1st Dept. 1951), aff'd, 304 N.Y. 671, 107 N.E.2d 592 (1952).

For the above stated reasons, the court concludes that Monarch cannot recover from American. The court also holds, alternatively, that even if Monarch could have amended its complaint to state a claim against Mowinckles, that claim would fail on the merits.

Since American is not liable to Monarch, American has sustained no loss for which it can receive indemnification from Mowinckles.